**ERNEST W. HAHN, INC.,**
**Plaintiff-Appellant,**

v.

**Hugh B. CODDING et al.,**
**Defendant-Appellee.**

**CODDING ENTERPRISES,**
**Plaintiff-Appellant,**

v.

**ERNEST W. HAHN, INC.,**
**Defendant-Appellee.**

**Nos. 77–2474, 77–2465.**

United States Court of Appeals,
Ninth Circuit.

March 20, 1980.

Richard J. Archer, Shovlin & Babin, San Francisco, Cal., for Codding Enterprises.

Michael N. Khourie and Thomas Paine, Broad, Khourie & Schulz, San Francisco, Cal. (argued), William N. Willens, Barrett, Stearns, Collins, Gleason & Kinney, Torrance, Cal., on brief, for Ernest W. Hahn, Inc.

Before ELY and ANDERSON, Circuit Judges, and JAMESON,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Hahn (Ernest W. Hahn, Inc.) and Codding (Hugh B. Codding and his company, Codding Enterprises) are developers and operators of shopping centers. Both attempted to obtain the right to develop a regional shopping center in downtown Santa Rosa, California. In 1972, the Urban Renewal Agency of Santa Rosa (Agency) selected Hahn as the developer and agreed to nego-

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

tiate with him exclusively. As the losing suitor in the contest for the Agency's affections, Codding became involved with several lawsuits challenging the proposed shopping center. In 1975, Hahn filed an antitrust action against Codding based on his involvement with the various lawsuits which had allegedly frustrated the development of the Santa Rosa shopping center (the Hahn complaint). In turn, Codding filed an antitrust action against Hahn, claiming actual and attempted monopolization of the regional shopping center market in California and the United States (the Codding complaint). On its own motion, the district court issued an order to show cause why both actions should not be dismissed after this court's decision in *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board*, 542 F.2d 1076 (9th Cir. 1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787. On December 22, 1976, an order of dismissal with leave to file amended complaints was entered in both cases. *Ernest W. Hahn, Inc. v. Codding*, 423 F.Supp. 913 (N.D.Cal.1976). After the complaints were amended, the court entered judgment on May 18, 1977, dismissing both complaints without leave to amend.

■ The district court had jurisdiction under 28 U.S.C. § 1337. Both parties filed their notices of appeal within thirty days from the entry of the final judgment. This court has jurisdiction under 28 U.S.C. § 1291. The primary issue raised by the dismissal of the Hahn complaint involves the scope of the *Noerr-Pennington* doctrine under the antitrust laws.[1] With the Codding complaint the central issue on appeal is the more general inquiry of whether a claim for relief was stated. Both issues present close questions. However, because we must accept the allegations of the complaints as true, and because of the policy disfavoring summary dismissals in antitrust

cases, we conclude that the court below erred when it dismissed the Hahn and the Codding complaints. We will first examine our scope of review in this type of case before turning to the individual complaints.

## I. SCOPE OF REVIEW

■ On appeal, this court must employ a "concededly rigorous standard" of scrutiny over the district court's dismissal of these cases. *See Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). Initially, we note that there is a policy disfavoring the pre-trial dismissal of antitrust actions because the proof lies largely in the hands of the defendants. *See Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *cf. California Computer Products v. International Business Machines*, 613 F.2d 727, 733–734 (9th Cir. 1979) (where this court found the policy inapplicable to directed verdicts). In its dismissal, the court below did not rely on any materials other than the pleadings. 423 F.Supp. at 916 n.3. Although not denominated as such, this was clearly a dismissal for failure to state a claim for relief under Fed.R.Civ.P. 12(b)(6). The Supreme Court has said that a complaint should not be dismissed under this rule "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Since we are reviewing a dismissal for failure to state a claim, we must take as true all material facts alleged in the respective complaints. *Hospital Building, supra*, 425 U.S. at 740, 96 S.Ct. at 1850; *see California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972). Moreover, a complaint is construed,

---

1. The *Noerr-Pennington* doctrine establishes the general rule that lobbying or other efforts by businessmen to obtain legislative, executive, or judicial action will not violate the antitrust laws, even though the purpose of their efforts may be to eliminate competition or otherwise restrain trade. *See* 7 von Kalinowski, Antitrust Laws and Trade Regulation, § 46.04. This will

be explained in more detail later in this opinion. The title of the doctrine is derived from the two principal Supreme Court cases which established it: *Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

and all doubts are resolved, in favor of the pleader. *Amfac Mortgage Corp. v. Arizona Mall of Tempe,* 583 F.2d 426, 430 (9th Cir. 1978). It also should be remembered in Sherman Act cases that each case must be reviewed in light of its own facts, and prior cases must be read in light of their facts. *Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1104 (1925).[2] Keeping these considerations in mind, we now turn to the respective complaints.

## II. *THE HAHN COMPLAINT*

### A. *Facts*

Hahn's amended complaint alleged claims for relief against Codding for violation of the Sherman Act and the California antitrust laws, as well as under common law theories of defamation and intentional interference with contractual relations. Since jurisdiction of the state law claims is pendent to the Sherman Act claims, it is only the Sherman Act claims which concern this court. In a detailed complaint,[3] Hahn describes the history of the urban renewal project in Santa Rosa, his selection as developer of the shopping center, and Codding's successful efforts at blocking the development.

In 1961, Santa Rosa adopted its urban renewal plan. Under Phase I of the plan several public buildings, including a new city hall, library, post office, and Federal Building, were constructed. After two major earthquakes in 1969, the plan was changed to include those downtown areas which had been damaged the most severely. The changes were referred to as Phase II. With Phase II, an additional thirty acres of land was acquired and cleared for redevelopment. Some ten acres of this land was sold to private businesses for construction of office and commercial buildings. In 1971, the Agency decided to use the remainder of the land for a regional shopping center. In March of 1972, Hahn was selected to develop the plan for the shopping center (over Codding).

After considerable planning, it was decided that the shopping center needed to be expanded and more land acquired. This is Phase III of the urban renewal plan. While Phase II was financed to a large extent by federal funds, no comparable financial assistance was available for Phase III.

Under the agreement between the Agency and Hahn for development of the shopping center, the Agency is responsible for clearing and preparing the land. The Agency needs approximately fifteen million dollars to finance this acquisition and preparation prior to transferring the shopping center site to Hahn. Since federal money is, on the most part, unavailable, the Agency must issue bonds to raise the necessary financing.

The Agency is authorized to issue parking lease revenue bonds, tax allocation bonds, or a combination thereof. The issuance of such bonds and their successful sale is de-

---

**2.** As Justice Stone said in the *Maple Flooring* decision:

"It should be said at the outset, that in considering the application of the rule of decision in these cases to the situation presented by this record, it should be remembered that this Court has often announced that each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and that the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied."

268 U.S. at 579, 45 S.Ct. at 583; *quoted with approval in GTE Sylvania Inc. v. Continental*

*T.V., Inc.,* 537 F.2d 980, 989 (9th Cir. 1976) (en banc), *aff'd Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Amateur Softball Ass'n. of America v. United States,* 467 F.2d 312, 316 (10th Cir. 1972); *Bridge Corp. of America v. American Contract Bridge League, Inc.,,* 428 F.2d 1365, 1370 (9th Cir. 1970), *cert. denied,* 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220; *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 79 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755.

**3.** After thoroughly reviewing Hahn's complaint, we are satisfied that it meets the "more specific allegations" rule of *Franchise Realty.* 542 F.2d at 1083.

pendent upon an unqualified opinion of bond counsel that the proposed bonds would be valid and enforceable. If there is any litigation challenging the Agency action or the security for repayment, regardless of how frivolous or baseless, then bond counsel cannot give an unqualified opinion and the bonds cannot be issued.

■ As previously explained, both Hahn and Codding are commercial real estate developers who are involved with the planning, development, construction, and management of commercial shopping centers. Hahn claims that the relevant market for purposes of this suit is the planning, development, construction, and management of commercial regional shopping centers in Sonoma County, California.[4] Hahn claims that Codding possesses dominant power within this market through its operation and control of the only major shopping centers, several smaller neighborhood or community centers, and two of the three sites suitable for the construction of a regional shopping center in close vicinity to Santa Rosa.[5]

Hahn alleges that Codding has acted in concert with several others [6] for the purpose of maintaining its monopoly and eliminating the actual and potential competition of Hahn's proposed regional shopping center. The primary thrust of Hahn's action is contained in the allegation that Codding and the other conspirators have filed and prosecuted "a series of overlapping, repetitive and baseless lawsuits against the City of Santa Rosa, the Agency, HUD, and plaintiff, with or without probable cause, and regardless of the merits of the claims asserted. . . ." This has been done with knowledge that Hahn's proposed shopping center could only proceed if necessary financing was secured by the issuance of bonds. And also with knowledge that the mere pendency of a lawsuit would preclude approval by bond counsel which is necessary before the bonds could be issued. Hahn states that Codding has filed nine, as well as covertly financing and underwriting four more, lawsuits, challenging various aspects of the downtown shopping center.[7]

---

4. We express no view as to the propriety of Hahn's definition of the relevant market except to accept it for purposes of reviewing the pretrial dismissal in the present case. Likewise, we express no opinion on the merits of any of the other elements of Hahn's antitrust claim. We confine our review to the applicability of the *Noerr-Pennington* doctrine, which was the only issue decided by the court below when it dismissed Hahn's complaint.

5. The major centers are Coddington and Montgomery Village; the smaller centers are Crossroads, Mayette Village, and Lakeside Shopping Center; and the two sites are seven miles south of Santa Rosa in Rohnert Park.

6. Others who are alleged to have participated in the antitrust conspiracy include: Coddington Center, Montgomery Village, Inc., the Rohnert Park Chamber of Commerce, Connecticut Mutual Life Insurance Co., Ivan Falk, Mrs. Ivan Falk, Save The Cal, Inc., Olma Carpenter, Harry DeLope, Taxpayers Committee for the Right to Vote, and the Rohnert Park City Council.

7. The lawsuits filed by Codding include:
 1. *Codding Enterprises v. Urban Renewal Agency et al.* (Sonoma County Superior Court No. 73240); filed April 25, 1973; disposition: order for dismissal entered May 7, 1973.
 2. *Codding Enterprises v. Urban Renewal Agency et al.* (Sonoma County Superior Court No. 73715); filed June 12, 1973; disposition: order of summary judgment entered November 26, 1973.
 3. *Codding Enterprises v. Urban Renewal Agency et al.* (Sonoma County Superior Court No. 75445); filed November 30, 1973; disposition: summary judgment entered August 19, 1974; affirmed on appeal October 23, 1975.
 4. *Codding Enterprises v. Urban Renewal Agency et al.* (Sonoma County Superior Court No. 75902); filed January 18, 1974; disposition: general demurrer to complaint sustained without leave to amend judgment of dismissal entered April 5, 1974.
 5. *Codding Enterprises v. James T. Lynn, et al.* (N.D.Cal. C–74–0802 SAW); filed April 12, 1974; disposition: order of dismissal for lack of standing entered July 26, 1974; judgment vacated and appeal dismissed for mootness March 29, 1976.
 6. *Codding Enterprises v. Urban Renewal Agency et al.* (Sonoma County Superior Court No. 79465); filed November 3, 1974; disposition: judgment for defendants on all claims entered December 7, 1976; rev'd and remanded in part, 1 Civil 41188 (Ct.App., unpublished opinion filed Apr. 26, 1978), *hearing denied* (Sup.Ct., June 28, 1978).
 7. *Codding Enterprises v. Urban Renewal Agency et al.* (Sonoma County Superior Court No. 79762); filed December 27, 1974; disposition: consolidated for trial with No. 79465;

Hahn's complaint contains further allegations charging that Codding has usurped to itself the sole power to determine the future of downtown Santa Rosa. By filing the series of lawsuits, Codding has expropriated the authority which formerly rested in the Agency and the City Council to determine the nature and scope of the urban renewal plan. Codding has publicized his intent to file lawsuits challenging every significant step in the renewal process, and that his trial strategy was to delay or postpone judicial resolution of the claims. And, Codding has assertedly made known the fact that the lawsuits and his opposition would be withdrawn if Hahn's shopping center were eliminated from the downtown plan.

B. *Discussion*

■ The court below concluded that Codding's involvement in the lawsuits was protected activity under the *Noerr-Pennington* doctrine. *See* n.1, *supra*. Moreover, the court found that Hahn had failed to state a claim for relief which would come within the sham exception [8] to the broad immunity afforded by the doctrine. To understand the scope of the *Noerr-Pennington* doctrine and the sham exception, it is necessary to trace the doctrine's evolution through the Supreme court cases which have developed it.[9]

In *Eastern Railroad Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), a group of trucking companies sued a group of railroads, claiming that the railroads had conspired to restrain trade and monopolize the long-distance freight business. The conspiracy claim was based on the allegation that the railroads had conducted a publicity campaign against the trucking industry "designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business." 365 U.S. at 129, 81 S.Ct. at 525. More particularly, it was claimed that the railroads had attempted to influence legislation and had even persuaded the Governor of Pennsylvania to veto a bill which was favorable to the trucking industry. The Supreme Court

judgment for defendants on all claims entered December 7, 1976; rev'd and remanded in part, 1 Civil 41188 (Ct.App., unpublished opinion filed Apr. 26, 1978), *hearing denied* (Sup.Ct., June 28, 1978).

8. *Codding Enterprises v. Urban Renewal Agency, et al.* (Sonoma County Superior Court No. 81799); filed June 13, 1975; disposition: consolidated for trial with No. 79465; judgment for defendants on all claims entered December 7, 1976; rev'd and remanded in part, 1 Civil 41188 (Ct.App., unpublished opinion filed Apr. 26, 1978), *hearing denied* (Sup.Ct., June 28, 1978).

9. *Codding Enterprises v. Urban Renewal Agency, et al.* (Sonoma County Superior Court No. 84237); filed December 31, 1975; disposition: consolidated for trial with No. 79465; judgment for defendants on all claims entered December 7, 1976; rev'd and remanded in part, 1 Civil 41188 (Ct.App., unpublished opinion filed Apr. 26, 1978), *hearing denied* (Sup.Ct., June 28, 1978).

The lawsuits financed and underwritten by Codding include:

10. *Oma Carpenter and Save The Cal, Inc. v. City of Santa Rosa, et al.* (Sonoma County Superior Court No. 78698); filed September 23, 1974; disposition: general demurrer to complaint sustained without leave to amend; judgment of dismissal entered March 30, 1976.

11. *Taxpayers Committee for the Right to Vote v. City of Santa Rosa, et al.* (Sonoma County Superior Court No. 79477); filed November 27, 1974; disposition: general demurrer to complaint sustained without leave to amend; judgment of dismissal entered March 30, 1976.

12. *Taxpayers Committee for the Right to Vote v. City of Santa Rosa, et al.* (Sonoma County Superior Court No. 84025); filed December 9, 1975; disposition: general demurrer to complaint sustained without leave to amend; judgment of dismissal entered March 30, 1976.

13. *City of Rohnert Park v. James T. Lynn, et al.* (N.D.Cal. No. C–74–2429 WWS); filed November 19, 1974; disposition: summary judgment entered December 8, 1976; remanded for dismissal sub nom. *City of Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir. 1979).

8. There is no precise definition to the sham exception. *See* Comment, 45 U.Chi.L.Rev. 80, 104–105 (1977). The easiest way to explain it is by saying the *Noerr-Pennington* doctrine does not exempt attempts to influence the government which are a sham. In the following discussion we do not attempt a black letter definition, but instead merely explain how the present case fits within the exception.

9. As previously pointed out, each case in this area must be read in context. *See* n.2, *supra*.

found it "clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." [10] 365 U.S. at 136, 81 S.Ct. at 529. Moreover, the Court said that the legality of the publicity campaign was not affected by any anticompetitive purpose the railroads may have had. While laying out this exemption from the antitrust laws, the Court also noted that there was an exception where the activities were a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." 365 U.S. at 144, 81 S.Ct. at 533.

The basic antitrust immunity established by *Noerr* was reaffirmed in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In cooperation with union officials, several large coal companies attempted to eliminate the competition of smaller coal companies by persuading the Secretary of Labor to set a higher minimum wage for companies selling to the TVA. In reversing a jury verdict which had been, in part, based on this, the Court stated:

"Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act."

381 U.S. at 670, 85 S.Ct. at 1593.

Seven years later, in *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court held that the *Noerr-Pennington* doctrine applied to attempts to influence adjudicative bodies. A group of truckers had allegedly conspired together to deter competitors from obtaining new or expanded operating rights from the California Public Utilities Commission and the Interstate Commerce Commission by opposing every such application, regardless of the merits. Writing for the Court, Justice Douglas made clear that the immunity afforded by *Noerr-Pennington* was grounded in the First Amendment rights of association and petition. Although the antitrust exemption was extended in *Trucking Unlimited*, the Court found that the plaintiff's complaint was improperly dismissed since a cause of action had been stated under the sham exception. Justice Douglas did not attempt to define the parameters of the sham exception, but instead listed several examples of activity which may come within it.[11] The most important example for

---

10. The Court based its decision on the informational needs of the government and the people's right of petition. As the Court explained:

"The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. . . . A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them."

365 U.S. at 139, 81 S.Ct. at 530–531.

11. Because of the importance of these illustrations, we quote what was said at length:

"Yet unethical conduct in the setting of the adjudicatory process often results in sanctions. Perjury of witnesses is one example. Use of a patent obtained by fraud to exclude a competitor from the market may involve a violation of the antitrust laws, as we held in *Walker Process Equipment [, Inc.] v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 175–177, [86 S.Ct. 347, 349–350, 15 L.Ed.2d 247]. Conspiracy with a licensing authority to eliminate a competitor may also result in an antitrust transgression. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 [82 S.Ct. 1404, 1414, 8 L.Ed.2d 777]; *Harman v. Valley National Bank*, 339 F.2d 564 (CA9 1964). Similarly, bribery of a public purchasing agent may constitute a violation of § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act. *Rangen, Inc. v. Sterling Nelson & Sons*, 351 F.2d 851 (CA 9 1965).

"There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the

our purposes was "a pattern of baseless, repetitive claims." 404 U.S. at 513, 92 S.Ct. at 613. The critical allegation in *Trucking Unlimited* was that the conspirator-truckers had used their power, strategy, and resources "to harass and deter [their competitors] in their use of administrative and judicial proceedings so as to deny them 'free and unlimited access' to those tribunals." 404 U.S. at 511, 92 S.Ct. at 612.

In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), Otter Tail, an electric utility, had attempted to monopolize, and had monopolized, the retail distribution of power by preventing communities where its retail distribution franchise had expired from replacing it with a municipal distribution system. One of the means which Otter Tail had utilized was to institute and support litigation designed to prevent or delay the establishment of municipal systems. The district court had held that the *Noerr-Pennington* immunity did not protect Otter Tail's litigation efforts because the doctrine only applied to efforts of influencing the legislative or executive branches of government. The Supreme Court remanded this part of the district court's decision with the following observation:

"That was written before we decided *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 [92 S.Ct. 609, 613, 30 L.Ed.2d 642] where we held that the principle of *Noerr* may also apply to the use of administrative or judicial processes where the purpose to suppress competition is evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims and thus is within the 'mere sham' exception announced in *Noerr*."

410 U.S. at 380, 93 S.Ct. at 1030–1031. On remand, the district court made the following findings:

". . . the repetitive use of litigation by Otter Tail was timed and designed principally to prevent the establishment of municipal electric systems and thereby to preserve defendant's monopoly . . the litigation comes within the sham exception to the *Noerr* doctrine as defined by the Supreme Court in *California Transport* . . .."

*United States v. Otter Tail Power Company*, 360 F.Supp. 451 (D.Minn.1973). This was summarily affirmed by the Supreme Court. 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).

The Supreme Court decision which is most directly applicable to the present case is *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977), where the Court interpreted how the sham exception applied to the judicial process. Unfortunately, neither this court, when it decided *Franchise Realty*, nor the court below, when it dismissed the present case,[12] had the benefit of the Court's decision in *Vendo*. Although there was no majority in *Vendo*, all three of the opinions discussed the sham exception in a manner which mandates its application to the present case.

In *Vendo* the plaintiff in an antitrust action in federal district court sought to enjoin the defendant's collection of a state court judgment. It was alleged that this judgment and the state court action which had awarded it, was part of the defendant's scheme to monopolize the relevant market. The precise issue confronting

---

other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, *viz.*, effectively barring respondents from access to the agen-

cies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression.' "

404 U.S. at 512–513, 92 S.Ct. at 613.

**12.** After the Court decided the *Vendo* case, Hahn filed a motion for reconsideration under Fed.R.Civ.P. 60. The court below, characterizing what was said about the sham exception as dicta, refused to reconsider the dismissal.

the Court was whether section 16 of the Clayton Act (15 U.S.C. § 26) was an expressly authorized exception to the Anti-Injunction Act. In addressing this question, it was necessary to also examine when court proceedings could form the basis of an antitrust suit. Justice Rehnquist, in the plurality opinion joined by two other justices, concluded that the Clayton Act was not an exception to the Anti-Injunction Act and, therefore, a federal court could not enjoin a state proceeding after it had been commenced. However, Justice Rehnquist did recognize that *Otter Tail* and *Trucking Unlimited* "may be cited for the proposition that repetitive, sham litigation in state courts may constitute an antitrust violation and that an injunction may lie to enjoin future state-court litigation." 433 U.S. 635 n.6, 97 S.Ct. at 2889 n.6. Justice Blackmun wrote an opinion in which The Chief Justice joined, concurring in the result reached in the plurality's opinion but on totally different grounds. Section 16 of the Clayton Act was viewed by Justice Blackmun as an expressly authorized exception to the Anti-Injunction Act. However, relying upon *Trucking Unlimited*, Justice Blackmun reasoned "that no injunction may issue against currently pending state-court proceedings unless those proceedings are themselves part of a 'pattern of baseless, repetitive claims' that are being used as an anticompetitive device." 433 U.S. at 644, 97 S.Ct. at 2894. Justice Blackmun did not believe that the single state court proceeding in *Vendo* came within the pattern of baseless, repetitive claims of *Trucking Unlimited*, or "some equivalent showing of grave abuse of the state courts . . . ." 433 U.S. at 644 n.*, 97 S.Ct. 2894, n.*. Justice Stevens, dissenting, in an opinion joined in by the remaining three justices, felt that the state court proceeding had been properly enjoined. According to Justice Stevens, the Clayton Act was an exception to the Anti-Injunction Act. Moreover, Justice Stevens felt that a single state court proceeding was sufficient to come within the sham litigation exception of *Trucking Unlimited*. 433 U.S. at 661–662, 97 S.Ct. at 2902–2903. And so, despite the lack of unanimity on

when an injunction should issue, *Vendo* does make it clear that repetitive sham litigation may constitute an antitrust violation. *See Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 670 (9th Cir., 1980).

■ Keeping the Supreme Court's development and interpretation of the *Noerr-Pennington* doctrine and the sham exception in mind, we return to Hahn's complaint. The antitrust claim is based on Codding's filing or underwriting of thirteen lawsuits challenging the downtown shopping center. Now, it is abundantly clear that Codding's action in invoking the judicial process is protected activity under the *Noerr-Pennington* doctrine. Our inquiry must then turn to whether Hahn has stated a claim for relief under the sham exception to this broad immunity. That is, has Hahn alleged sufficient facts to show that Codding's activities were a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533.

■ As previously pointed out, we must accept the allegations in Hahn's complaint as true and draw all reasonable inferences in its favor. The complaint says that, for purposes of maintaining its monopoly in the relevant market and eliminating Hahn as a competitor, Codding has filed or underwritten thirteen overlapping, repetitive, and baseless lawsuits against Hahn and the proposed shopping center. The Supreme court has firmly established the rule, in *Trucking Unlimited*, *Otter Tail*, and *Vendo*, that a pattern of baseless, repetitive claims can come within the sham exception. *Trucking Unlimited*, 404 U.S. at 513, 92 S.Ct. at 613; *Otter Tail*, 410 U.S. at 379–380, 93 S.Ct. at 1030–1031; *Vendo*, 433 U.S. at 635 n.6, 644, 662, 97 S.Ct. at 2889 n.6, 2894, 2903.

■ Moreover, the complaint contains sufficient allegations that Codding's purpose in bringing the court proceedings has been little else than to interfere directly with Hahn as a potential competitor. Codding has knowledge that Hahn's shopping

center is dependent upon financing secured by issuing bonds. Codding likewise has knowledge that these bonds cannot be marketed if there are lawsuits pending. Therefore, according to the complaint, the thirteen lawsuits have been used, thus far successfully, as a means to halt development of the downtown shopping center and prevent Hahn's entrance into the market as a competitor to Codding. Another factor we rely upon is that each one of the various lawsuits has been decided against Codding. This certainly is the hallmark of insubstantial claims referred to by Justice Douglas in *Trucking Unlimited*.[13]

And so, construing the complaint in Hahn's favor, the injury to Hahn has not been an indirect one resulting from Codding's genuine efforts to have his claims heard in court. *See Noerr*, 365 U.S. at 142–143, 81 S.Ct. at 532–533. Codding has stated that he would withdraw his lawsuits when the Agency agreed to drop Hahn and the regional shopping center from the urban renewal project. From this statement and the fact that none of the lawsuits has met with any other success than to delay the shopping center, it can be inferred that Codding's efforts in the courts have been something less than genuine. Thus, a reasonable construction of the complaint is that Codding has used the courts as a means of directly interfering with the business relations of a competitor by preventing Hahn from entering the market.

■ We hold that these allegations are sufficient to state a claim for relief under the sham exception. Nevertheless, we will proceed to address some of the arguments made by Codding in support of the dismissal.

■ Initially, Codding asks this court to resolve several disputed factual issues. Codding claims that some of the lawsuits have successfully obtained the requested relief. Additionally, Codding asserts that several of the others are taxpayer lawsuits which are privileged under California state law. However, this court only has a motion to dismiss before it, and, as such, we must confine our review to the allegations contained in the complaint, and a determination of whether Hahn can prove any set of facts in support of his claim for relief. While it may be possible to resolve this type of question in pre-trial proceedings by a summary judgment motion (*see Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665 (9th Cir., 1980)), it is not possible to do so with a dismissal for failure to state a claim.

■ Codding's major argument in support of dismissal is that the present case is controlled by *Franchise Realty. Interstate Corp. v. San Francisco Local Joint Executive Board*, 542 F.2d 1076 (9th Cir. 1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787. We reject Codding's suggestion that we blindly follow *Franchise Realty*.[14] The rules of decisions in antitrust cases must not be construed too literally, but should be viewed within the context of the particular factual situations presented. *See GTE Sylvania Inc. v. Continental T.V., Inc.*, 537 F.2d 980, 989 (9th Cir. 1976) (en banc), *aff'd, Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

In the *Franchise Realty* case this court affirmed the dismissal of an antitrust com-

---

**13.** While success before the political or adjudicative body is not the sole criterion for determining whether a course of proceeding was undertaken as a sham to interfere directly with the business relationships of a competitor, it is a factor considered in determining whether a cause of action is stated under the sham exception.

**14.** It has been suggested that *Franchise Realty* requires a showing of some activity other than the alleged abuse of the judicial process and perhaps a showing that the plaintiff has been

barred from meaningful use of the agency or tribunal. *See Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 998 (9th Cir. 1979) (Kennedy, J., concurring), *cert. denied*, —— U.S. ——, 100 S.Ct. 688, 62 L.Ed.2d ——. While *Franchise Realty* may be read in this manner (*see* 542 F.2d 1081–1082 n. 4), in view of what the decision itself says when discussing *Otter Tail* and the later Supreme Court decision in *Vendo*, we decline to follow this interpretation under the alleged facts in this case.

plaint. In that case McDonald's had brought a Sherman Act Section One (15 U.S.C. § 1) case against two associations of restaurant and hotel employers and a labor union. McDonald's charged that the defendant associations and union had repeatedly, baselessly and in bad faith, opposed the granting of building permits to McDonald's (for the construction of new McDonald's restaurants) by the San Francisco Board of Permit Appeals (Board). Judge Duniway, writing for this court, found that the defendants' activities in opposing the issuance of building permits were protected by the *Noerr-Pennington* immunity.

Although Codding argues that *Franchise Realty* supports the dismissal in the present case, we find *Franchise Realty* distinguishable. McDonald's failed to offer any support for its conclusory allegation that the defendants' opposition before the Board was "sham" or "frivolous." 542 F.2d at 1079. Here, Hahn's complaint alleges that each one of Codding's thirteen lawsuits was baseless, and that each one of the lawsuits has been decided against Codding summarily. Moreover, in *Franchise Realty* the defendants were successful in their efforts before the Board. Hahn's complaint alleges that Codding has not been successful on the merits of even one of the lawsuits. Additionally, the Board in *Franchise Realty* was as much "a political as an adjudicatory body." 542 F.2d at 1079. Activity which is acceptable in the political area does not necessarily retain its *Noerr-Pennington* immunity when it is used in the judicial process. *See Trucking Unlimited*, 404 U.S. at 513, 92 S.Ct. at 613. Here, Codding has invoked the judicial process not once, but thirteen times, in what the Hahn complaint describes as a thus far successful effort to prevent a competitor from entering the marketplace.

And, more importantly, Judge Duniway's interpretation of *Otter Tail* in *Franchise Realty* is fully consistent with our interpretation and application of it to the present case.[15] Here, Codding has allegedly used its threat of litigation as a bludgeon in its attempts to retain a monopoly in the regional shopping center market. The mere filing of a lawsuit was enough to prevent Hahn from entering the market as a competitor of Codding. The present case is a "through the looking glass" version of *Franchise Realty* and thus controlled by *Otter Tail*.

 Codding also argues that Hahn is misusing the antitrust laws in an attempt to chill Codding's First Amendment rights. We acknowledge the First Amendment underpinnings of the *Noerr-Pennington* doctrine and the interests it is designed to protect. *Trucking Unlimited*, 404 U.S. at 510, 514-515, 92 S.Ct. at 611, 613-614; *Franchise Realty*, 542 F.2d at 1082. Nevertheless, this court should not underestimate the importance of the Sherman Act and the

---

**15.** We quote Judge Duniway's discussion at length:

"As in *Trucking Unlimited*, the complaint in *Otter Tail* alleged that the defendant had threatened potential competitors—municipalities seeking to take over electric power facilities then operated by the defendant—with instigation of baseless proceedings—litigation which had the effect of delaying and increasing the expense of sale of municipal securities necessary to finance the takeover. The defendant allegedly hoped that the added expense and delay would force the municipalities to abandon their takeover plans and renew their power contracts with the defendant. Thus, the gravamen of the government's case in *Otter Tail* was not defendant's instigation of the litigation, a right guaranteed by the First Amendment, *see Trucking Unlimited, supra,* 404 U.S. at 510, 92 S.Ct.

609, but the fact that the defendant had used the threat of litigation as a bludgeon in its attempts to retain its monopoly in the regional electric power market.

"In one respect *Otter Tail* is a 'through the looking glass' version of the case at bar. In that case, whenever a community sought to go into the power business, Otter Tail sued. The effect of the mere filing of the action destroyed the community's ability to proceed. Nobody would buy its bonds while the action was pending. Mere filing was enough to accomplish Otter Tail's purpose. In our case, that is not so. Mere opposition would not defeat McDonald's purpose; to do that, defendants had to persuade the Board to rule in their favor—and it is alleged that they succeeded."

542 F.2d at 1084.

interests which it protects. *United States v. Topco Associates*, 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 575 (1972).[16] By reversing the dismissal in the present case we do not intend to elevate Sherman Act interests over First Amendment interests. Our review was limited to the allegations contained in Hahn's complaint. In striking the balance in favor of the antitrust interests in this decision, we do not decide, nor should this opinion be read as deciding, how that balance should be struck at a later stage of the proceedings in this case.

### C. *Conclusion*

In summary, we hold that Hahn's complaint was improperly dismissed. Based on the preceding discussion, we cannot say that it appears beyond doubt that Hahn can prove *no* set of facts in support of his antitrust claim under the sham exception.

### III. *THE CODDING COMPLAINT*

Codding's amended complaint alleged five claims for relief against Hahn for violations of the Sherman Act and California law. Since jurisdiction of the two state law claims is pendent to the Sherman Act claims, it is only the three Sherman Act claims which concern this court. The first and third claims attempt to state causes of action under Sherman One and Two (15 U.S.C. §§ 1, 2) and the second claim attempts to state a cause of action under Sherman One.

The district court said that Codding's amended complaint "consists of an enumeration of perfectly lawful acts embellished with conclusory and pejorative labels." C.R. 516. Aside from this, the court below offered little else as a basis for its dismissal of Codding's complaint.

Codding makes several general allegations which are incorporated into each of his three claims for relief. The relevant product market is claimed to consist of "the planning, development and construction of commercial regional shopping centers, within the United States and the State of California and particularly in urban renewal areas." C.R. 551. Hahn is alleged to be the seventh largest developer of commercial regional shopping centers in the United States, with a 90% share of the California market of regional shopping centers. In addition to Hahn, the complaint claims that Sears (Sears, Roebuck & Co.) and Macy's (R. H. Macy & Co., Inc.) have also participated in the conspiracy against Codding. Sears is the world's largest retailer, whose wholly-owned subsidiary, Homart, is the sixth largest developer of commercial regional shopping centers. Both Sears and Macy's, another large retailer, want to establish retail outlets in Santa Rosa. As his injury, Codding alleges that his profits have "been seriously impaired" and his "costs of doing business have increased" as a result of Hahn's actions. In addition, Codding claims to have "suffered an immense loss of good will" and a substantial reduction in the value of his business. We now turn to the specific allegations of Codding's three claims for relief.

### A. *First Claim*

Codding argues that his first claim adequately states a cause of action for attempted monopolization under Sherman Two and for a combination in restraint of trade under Sherman One. In his complaint, Codding has listed seven examples of predatory behavior committed by Hahn which allegedly support the first claim.[17]

---

**16.** As the Court observed in *Topco*:

"Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."

405 U.S. at 610, 92 S.Ct. at 1135.

**17.** These include:

(a) eliminating competition among themselves;

(b) obtaining on-site and off-site improvements worth approximately $6,000.00 for said proposed shopping center to be furnished free of charge to HAHN and to be paid for by the taxpayers;

(c) obtaining property for said proposed shopping center at less than the cost of ac-

Codding does not dispute Hahn's contention that some of these acts are "immune from antitrust liability because [they] represent nothing more than the receipt of the benefits flowing from governmental action successfully solicited and induced by Hahn." All Codding does is to suggest that this court "disregard" Hahn's arguments on this point. We decline. The predatory behavior in paragraphs (b) through (e) consists of nothing more than the benefits incident to Hahn's selection as the developer of the downtown Santa Rosa project. Not only does Codding not attempt an explanation as to how these activities could support an antitrust claim, but he also fails to explain why Hahn's activities would not be protected under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and the *Noerr-Pennington* doctrine.

This leaves three other allegations of predatory activity under the first claim:

(a) eliminating competition among themselves;

(f) selling land below cost to potential operators of retail stores; and

(g) refusing to consider competitors of Sears.

Codding does not even bother to discuss the first or the last allegation in his briefs. The elimination of competition is an essential ingredient in any antitrust action. Nevertheless, there must still be some factual basis for such a charge. Codding's complaint, even when considered in its entirety, fails to show how he has standing to base an antitrust claim on the last allegation. The only allegation of predatory activity which can support Codding's antitrust claim is (f) which deals with sales below cost. Since this also forms the basis of Codding's third claim, we will reserve our

discussion on that issue until we reach the third claim.

## B. *Second Claim*

Codding contends that his second claim states a cause of action under Sherman One. In reviewing this argument, it is important to keep the essential elements of the Sherman One cause of action in mind. These are:

(1) an agreement among two or more persons or distinct business entities;

(2) which is intended to harm or unreasonably restrain competition; and

(3) which actually causes injury to competition.

*Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290 (9th Cir. 1979).

It is alleged in the second claim that Hahn has entered into an agreement with Sears and Macy's for the purpose of developing a downtown shopping center in Santa Rosa. According to the complaint, both Sears and Macy's, either directly or through subsidiaries, are competitors of Hahn and Codding in the development and construction of downtown regional shopping centers. Under the terms of the agreement, Hahn is to have a 75% interest in the shopping center, both Sears and Macy's will each have a 10% interest, while The Robert Campbell Company will have a 5% interest.

Codding alleges that the purpose and effect of the agreement is to eliminate competition in the development of shopping centers in the Santa Rosa market. Sears, Macy's and Hahn, individually, had the ability to enter the market as potential competitors of Codding and one another. By agreeing among themselves, they have eliminated competition with each other. The joint venture agreement has injured

quisition, which sale below cost is to be subsidized by the taxpayers;

(d) obtaining a guaranteed maximum cost for themselves for the maintenance of parking facilities with any cost in excess of that maximum to be paid for by the taxpayers;

(e) obtaining imposition of a building permit moratorium covering CODDING'S Coddingtown shopping center in order to prevent CODDING from obtaining additional tenant-

customers and to insure that HAHN'S proposed shopping center would obtain such tenant-customers. In the case of Mervyn's Department Store such effort has succeeded;

(f) selling land below cost to potential operators of retail stores; and

(g) refusing to consider competitors of Sears.

C.R. 551–552.

Codding because it gave Sears, Macy's, and Hahn a competitive advantage in dealing with others, including Codding, which would not have occurred if the three strong competitors had independently pursued their aims.

From this, it appears that Codding's second claim does state a claim for relief. There is an agreement between Hahn, Macy's, and Sears, three distinct business entities. The purpose of the agreement is to restrain competition among themselves and to injure Codding and place him at a competitive disadvantage. While Codding may face a difficult task in attempting to show any antitrust injury to himself, we cannot say at this point that Codding can prove no set of facts in support of his theory.

Hahn argues that *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), supports the dismissal of the second claim. However, we believe that Brunswick is distinguishable from the present case, at least at this stage of the proceedings. The antitrust injury in *Brunswick* had "no relationship to the size of either the acquiring company or its competitors." 429 U.S. at 487, 97 S.Ct. at 697. According to Codding's theory, his injury or potential injury is directly related to the size and market power of the three firms which have joined together. Codding may be able to prove an antitrust injury. *See Brunswick, supra*, 429 U.S. at 490, n.16, 97 S.Ct. at 694 n.16.

### C. Third Claim

■ According to Codding, his third claim "states a cause of action under Sections 1 and 2 of the Sherman Act." However, Codding only attempts to show how the third claim states a cause of action for attempted monopolization under Sherman Two. While we agree that the third claim states a claim for relief under Sherman Two, it cannot be construed as stating a claim under Sherman One.

All of the predatory acts alleged in the third claim are unilateral in nature. There is no averment of a contract, combination, or conspiracy as required by Section One. In the total absence of any allegation of agreement or concerted action, we have no trouble in concluding that Codding's third claim fails to state a claim for relief under Section One.

■ We turn now to the attempt to monopolize claim under Sherman Two. This has three essential elements. These are:

(1) a specific intent to control prices or destroy competition;

(2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and

(3) a dangerous probability of success.

*Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494. The first element (specific intent) can be satisfied "by inference drawn from proof of predatory or anticompetitive conduct which constitutes an unreasonable restraint of trade." *Id.* The third element (dangerous probability of success) can be satisfied "by inference drawn from proof of specific intent." *Id.*

■ The third claim contains sufficient allegations of predatory conduct. Codding states that Hahn has sold land, commercial real estate buildings and developments, and services at prices below cost to certain chain department store companies. In addition, Codding's complaint states that these companies have been given concessions which have included free land, buildings, and off-site improvements, as well as discriminatory prices, discounts, allowances, rebates, commissions, and terms of payment not granted to other store owners on proportionately equal terms. Codding alleges that Hahn has financed this scheme by charging high and profitable prices in those geographic areas where he experiences little or no competition. This enables Hahn to charge unreasonably low and below cost prices in areas such as Santa Rosa where there are competitors like Codding. As this court said in *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122:

"A business may choose to price at non-remunerative levels in order to exclude or drive out its rivals. Such 'predatory pricing' may be a means of obtaining or maintaining a monopoly position in violation of section 2 of the Sherman Act, 15 U.S.C. § 2."

(citations omitted)

570 F.2d at 855. Therefore, Codding's claim contains a sufficient averment of predatory conduct to satisfy the second requirement of a Section Two cause of action. Moreover, from this anticompetitive conduct, it is possible to infer the specific intent which is also necessary to support a Section Two claim. *Gough, supra,* 585 F.2d at 390; *Hallmark Industry v. Reynolds Metal Company,* 489 F.2d 8, 12 (9th Cir. 1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 1028. Moreover, Codding has satisfied the third element, that is, "dangerous probability of success." Market power can be relied upon to establish dangerous probability. *Hallmark Industry, supra,* 489 F.2d at 12. The allegation of a 90% share of the California market in regional shopping centers shows sufficient probability to withstand a motion to dismiss the complaint.

Hahn raises two arguments in response to the attempted monopolization charge. First, Hahn contends that sales of land below cost would not support a Sherman Act claim. And second, Hahn brings up a "meeting competition" defense.

Hahn cites two cases in support of his contention that sales of land below cost cannot support a Sherman Act claim. *Pacific Engineering & Production Co. v. Kerr-McGee Corp.,* 551 F.2d 790, 796 (10th Cir. 1977), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160; *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792. Neither case can be read as supporting Hahn's argument.[18]

■ Likewise, Hahn does not gain any support from his meeting competition argument. This court is reviewing a successful motion to dismiss for failure to state a claim. Only the allegations of Codding's complaint are before us, and they, of course, cannot be read as establishing such a defense.

### D. *Conclusion*

In summary, we hold that Codding's first claim was properly dismissed except insofar as the allegation of below cost pricing is included in his third claim. The second claim sufficiently states a cause of action under Sherman One, while the third claim adequately alleges a cause of action for attempted monopolization under Sherman Two. The second and third claims should not have been dismissed.

Our reversal should not be read as an approval or acceptance of Codding's theory of his case. It must be remembered that our review was limited to the allegations contained in Codding's complaint. Moreover, we were required to construe these allegations in Codding's favor. We reverse the dismissal of the second and third claims because we cannot say, at this stage of the proceedings, that Codding could prove *no* set of facts in support of his claims for relief.

REVERSED and REMANDED.

18. In *Pacific Engineering,* the Tenth Circuit discussed below cost pricing as follows:

"The Supreme Court has indicated that any price below cost may be considered predatory. *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 696 n.12, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). We do not believe, however, that the Court has established a definitive standard. The Court was speaking of the 'inferential value' of below cost sales. In some instances there is no inference to be taken from selling below total cost. It may even be desirable and certainly could not be considered 'sinister.'"

551 F.2d at 796. And, in *Hanson* this court said:

"While proof of pricing below marginal or average variable cost is prerequisite to a prima facie showing of an attempt to monopolize, such a showing, if made, would not show a per se violation. There may be nonpredatory and acceptable business reasons for a firm engaging in such pricing. Plaintiff's showing of below-cost pricing merely clears the first hurdle and raises the question of justification."

541 F.2d at 1359 n.6.